Jack Lawrence Earl, Jr.  //  pro se
#302235
Goose Creek Correctional Center
22301 West Alsop Road
Wasilla, AK                    99623

FILED in the Trial Courts
State of Alaska Third District

JUL 13 2022

Clerk of the Trial Courts
_____ Deputy

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| JACK LAWRENCE EARL, JR., <br><br> Plaintiff, <br><br> vs. <br><br> STATE OF ALASKA, DEPARTMENT OF CORRECTIONS, <br> KELLY GOODE, Deputy Commissioner-AKDOC, <br> LAURA BROOKS, HARS Director & Medical Advisory, <br> JACQELINE VILLACORTA, Standards Administrator, <br> EARL L. HOUSER, Superintendent-Goose Creek, <br> DR. ERIC A. NIMMO, Physician-Goose Creek, <br> ANGELA J. STROMMER, APN/PA-Goose Creek, <br> DAVID NEWMAN, A.D.A. Coordinator, State of Alaska, <br> JOHN DOE, <br> JANE DOE, <br><br> Defendant(s). | Case No. 3AN-22-07411 CI |

## C O M P L A I N T

COMES NOW, Jack Lawrence Earl, Jr. (herein after Earl) plaintiff appearing without the benefits of counsel, pro se, and does bring forth this complaint against all defendants' jointly and/or severely on all triable issues for relief.

FURTHERMORE, plaintiff Earl DEMANDS Trial by Jury.

## JURISDICTION AND VENUE STATEMENT

This court has jurisdiction over all parties and all civil matters in this action pursuant to AS 22.10.020(a)(b)(g) & (i).

Venue is proper since controversy commenced in the Third Judicial District and all defendants' reside in that district, and under normal circumstances defendants' will be represented by the State Attorney General's Office.

## P A R T I E S

1. Jack Lawrence Earl, Jr. (Earl) plaintiff, is a prisoner of the State of Alaska and is a resident, housed by Corrections, at the Goose Creek Correctional Center (herein after GCCC) in Wasilla, Alaska.

2. Kelly Goode, defendant, during all times relevant to this action was a resident of the State of Alaska, and held the position of Deputy Commissioner of Corrections, and is being sued in her individual and official capacities.

3. Laura Brooks, defendnat, during all times relevant to this action was a resident of the State of Alaska, and held the positions of HARS Director and Medical Advisory for Corrections, and is being sued in her individual and official capacities.

4. Jacqueline Villacorta, defendant, during all times relevant to this action was a resident of the State of Alaska, and held the position of Standards Administrator for Corrections, and is being sued in her individual and official capacities.

5. Earl L. Houser, defendant, during all times relevant to this action was a resident of the State of Alaska, and held the position of Superintendent at the Goose Creek Correctional Center in Wasilla, Alaska for Corrections, and is being sued in his individual and official capacities.

-2-

6. Eric Nimmo, defendant, during all times relevant to this complaint was a resident of the State of Alaska and held the position of supervising physician at GCCC for the State of Alaska, Department of Corrections, and is being sued in his individual and official capacities.

7. Angela J. Strommer, defendant, during all times relevant to this complaint was a resident of the State of Alaska and held the position of APN/PA at GCCC for the State of Alaska, Department of Corrections, and is being sued in her individual and official capacities.

8. David Newman, defendant, during all times relevant to this complaint was a resident of the State of Alaska and held the position of A.D.A. (American's with Disabilities Act) Coordinator, for the State of Alaska, and as such heard and decided ADA Accommodation Request appeals submitted by inmates that had been denied in-house, and is being sued in his individual and official capacities.

## STATEMENT OF THE CASE

9. Earl realleges and incorporates the allegations set firth in the proceeding paragraphs as if fully set forth herein.

10. In the later part of 2020 Earl complained to Lemon Creek Correctional Center (herein after LCCC) medical regarding localized pain in the left hip area, and after he was examined by contract doctor Thompson, and after a follow-up examine, x-rays were ordered at Bartlett Regional Medical Hospital (herein after BRH) in Juneau.

11. The technician concluded that there didn't appear to be anything wrong, but the pain persisted and LCCC medical was again notified, Earl was seen and more x-rays were ordered. This the x-rays showed major deterioration of the left hip area, and plans commenced to get a total hip-replacement at BRH.

-3-

12. By this time the Covid19 pandemic was well established at LCCC requiring that everyone wear a mask, social distants to the extent possible.

13. On or about 7/23/2020 Earl believing his surgery would be performed in Juneau close to family members, and where he would be able to begin his college correspondence course from Adams State University of Colorado, in Advance Paralegal Studies I & II during recovery, was called to booking by superintendet Bob Cordle, and told that he had stopped the checks (furnished by the Inmate Council Fund) concerning the college course, and that eventhough surgery was to take place in Juneau, Laura Brooks had suddenly changed those plans and that you're **"being transferred to Goose Creek to stage for the procedure."**

14. Earl of course adamantly objected, but ultimately knew it futile, and asked **"will they treat me like you guys do here?"** Meaning, that Earl's disability accommodations, one and all had been honored since his arrival 4/29/2010. Mr. Cordle, patted his chest said **"when you return I'll make you whole, I'm not a fake person."** This apparently because he too believed the change somewhat egregious and felt bad for Earl.

15. Superintendent Mr. Cordle than stated that **"I was asked by Mr. Brann Wade** (the Chief Classifcation Officer) **if I wanted you** (Earl) **back at Lemon Creek, and I told him YES I do."**

16. That night Earl was "rolled-up" he took his property (except for his TV, coax comfortor and personal mattress) to booking and him and officer Sarah Jones inventoried and boxed it upi for storage until his return. Earl hopes staff collected the items left in cell D7 the morning of his transport.

17. The following morning 7/24/2020 Earl was called to booking and he and another inmate (Sinmister Krakker) were transported by Alaska State Troopers plane to Anchorage.

18. From there Earl and the other inmate were driven to another location where two other inmates were placed in the transport van and we drove non-stop to GCCC.

-4-

19. Covid19 at the time was ravishing the state and when we arrived all four of us were placed for covid-quarantine in the special housing unit (herein after SMU) where Earl was told would be a 14 day process.

20. Upon Earl's arrival in SMU he stated to the attending officer's that he had a colostomy, and a 2000 ADA agreement concerning his housing under the ADA with the State of Alaska, Department of Corrections, and after explaining it to the Officer (Haley) he was placed, by himself, in a self-sufficient ADA cell. [SMU26]

21. For the Court's information, Earl has had his disability since 4/11/1996, and since then has, by a process of elimination, discovered that 1 banana per-day and the use of lactose-free milk significantly enhances his daily life, and as such since 2001 and 2019 (respectively) these simply, natural **ADA Assistive Items** have been supplied him by both contracted out-of-state private for profit prisons and in state operated prisons without any problems, nor paperwork of anykind, other than memoranda to relevant kitchen and facility administrative staff, that is until his arrival at GCCC.

22. Earl continued to experience what was noted in associated covid19 facility memo randums, symptoms such as loss of balance, dizziness, blurred vision, hearing waterlike sounds in his ears during rest times, sleepiness and general malfunction. Not to forget the constant pain in the left hip area.

23. As mentioned at #20 above Earl had filed a ADA complaint in 1999 with then State of Alaska, ADA Coordinator Mr. Don Brandon, and the results were a written "Final Decision" in 2000 which layed out expected and agreed up accommodations and housing the State of Alaska, Department of Corrections must adhere to **"no matter where he is housed, until the end of his sentence."** This agreement was made with the understandings of the investigator and complaintant, that the cell would contain a toilet, and sink with hot and cold running water. A self-sustaining ADA cell, that Earl would be housed alone in.

24. This **"agreement"** was fully adhered to in all state and private prisons, until Earl's arrival at open-population following covid19-quarantine.

-5-

25. In a medical Request for Interview (herein after RFI) Earl requested the continuance of the ADA assistive items to wit: 1 banana per-day and lactose-free milk, sending alike RFI to the GCCC Kitchen Stewart. In a following Medcial Communication, defendant Anglea J. Strommer, summarily denied these assistive items, instead wrote for Earl to **"pick and choose off your tray what you would like to eat. You may refrain from drinking milk if it causes you distress. Lactaid may also be purchased off commissary to use at your convenience."**

26. It should be acknowledged by this Court that **"Lactaid"** would require funds to purchase off commissary, at which time Earl did not possess, nor does commissary retain or make consistenly available the **Lactaid.**

27. Upon the conclusion of the mandatory 14 day covid-quarantine Earl informed Nurse III Brianna Eisenbacher of the 2000 ADA "Final decision" agreement regarding housing, etc. and that before moving him to open-population (Earl believed all cells had toilets and sinks in them) that wherever he was going the officers should know the requirements, and she said she would investigate, but probably wouldn't be moved until the following monday.

28. Nurse Eisenbacher returned later the same afternoon and told Earl that **"everybody knows about you, you will be housed appropriately"** also stating the "ADA stuff is in your file."

29. Nurse Eisenbacher was unthruthful, when Earl was moved from SMU to open-population in Hotel Module, **no staff had any knowledge, nor information regarding any ADA requirements, nor even Earl as disabled,** no relevant information whatsoever.

30. Earl was put into cell H18 with another inmate, the cell was not a ADA cell by the clear definition due to no toilet, no handrails and no sink with hot and cold water. It was called an ADA cell merely because a wheelchair could fit through the celldoor and it had a table wherein a wheelchair could go under occupied.

31. Earl had expectations as to the configuration of an ADA cell since everywhere he had been bwfore, even SMU, had ADA qualified and operational ADA cells.

32. In fact GCCC has no open-population ADA cells.

-6-

33. Hotel Module instead had community showers, community toilets and sinks and was in a dormitory type environment, more suited for pre-trial offenders. There was no place where Earl could have the **privacy necessary to do the intimate self-care requirements a** colostomy demands, when it demands.

34. When Earl brought his objections to the Hotel Officers, he was called into the "CORE" (it is where offices for staff are) and was aggressively approached by Sgt. Jeff Talley, and threatened with segregation because they could not fulfill their contractual 2000 ADA agreements and associated housing expectations. The pre-existing 2000 ADA agreement and GCCC's inability to adhere was placed squarely upon Earl, as his fault and not that of GCCC, and was put into a position of compromise, by either being totally ignored as a disabled person with an agreement with the Department of Corrections, or be **locked down for 23 hours a day** in a segregation module for exercising his rights under that agreement. Earl having violated no rules, and being locked down would be violative of his right to be housed in the **"least restrictive setting"** congruet with his custody and security classification, as well as his good behavior, was basically forced to forego his rights under the ADA "Final Decision" and went back to cell H18 reluctantly.

35. Earl submitted grievance regarding the arbitrary denial of the continuations of the ADA Assistive Items, after having been denied via RFI (see GCC20-402) but it was erroneously screened back, claiming that Earl had not first attempted to informally resolve. This too is **untruthful.**

36. In fact in an **undated** Investigator's Findings & Conclusions, defendant Eric Nimmo wrote **"one banana daily has been discontinued when Inmate Earl arrived at Goose Creek,"** this was done arbitrarily and without examining nor speaking with Earl, a case of clear deliberate indifference of GCCC supervisory medical staff. In fact, in a leter response defendant Eric Nimmo claimed the discontinuance was done by defendant Laura Brooks **"HARS policy limiting special dietary measures."**

37. Earl concluded from defendants' combined replies that **they thought all colostomies were the same** in every way.

-7-

38. Earl submitted an RFI to medical 8/25/20 requesting them supplement his diet to compensate for the nutrition and calories lost to him by his inability to utilize the 2% milk supplied to use to eat cereals supplied. However, this RFI was never responded to.

39. Earl was placed time and time again into embarassing, huniliating and self-depreciating situations when being forced to do self-care in front of other inmates and female staff who from time to time would walk by the community toilets. Earl was harassed, ridiculed, tormented and even accused of getting fecal matter all over the toilet. He takes great pains to constantly exhibit excellent hygiene and personal appearance, so as never to offend.

40. Earl functioned (and continues to function) under extreme constant mental pressure depression and trepidation, to his own detriment, to the point that he contacted mental health , as his hostile environment and forced public colostomy self-care, anxiety, anger depression and hopelessness for relief made it necessary to increase his 30 m/g Prozac to 40 m/g Prozac everyday, becuase the lower dose was not as effective, and his condition was worsening. The doseage was increased(see RFI dated 9/03/20)

41. Earl having made numerous complaints, was concerned about retaliation from GCCC administration and called a lawyer friend of his (Wallace Holland Tetlow) to explain to him what was going on and why he had called.

41. Defendant Earl L. Houser concurred with defendant Eric Nimmo's discontinuance of the ADA Assistive Items, without speaking with Earl (the plaintiff) why he needed them, or how long he'd been receiving them, causing Earl (the plaintiff) further mental and physical hardships.

42. It should be noted that the ADA Assistive Items allowed Earl a better way of life when dealing with his disability, and the erroneous and arbitrary discontinuances of them reversed that, making life more and unnecessarily complicated when dealing with his disability, incarceration and social interactions.

-8-

43. On 11/17/20 Earl was escorted from Hotel Module for pending surgery, and once he learned he was being housed in SMU covid19-central,he objected, only to be threatened by his escort, **"no SMU, no surgery"** so Earl reluctantly entered SMU.

44. He was met by a female officer (Christensen) and asked her if the cells had been fully and properly disinfected and cleaned, to which she assured Earl they were, then told him to go into cell SMU14.

45. When Earl entered the cell it had **not** been cleaned nor disinfected, in fact it was filthy, with rotten appele cores in the trashcan, sink covered in soap scum, with used handsoap on the rim, the toilet had urine and fecal matter in it and smelled of old urine as did the bunk area and mattress. When Earl complained to this officer, she closed the celldoor, stating **"too bad, so sad"** and walked off. Earl attempted to tidy up as best he could, but could not disinfect, using toilet paper to wipe surfaces down.

46. Earl called this officer asked two questions. The first was can I move to a clean-ed and disinfected cell, to which she stated "no," then he asked if he could use the mat-tress from the top bunk to use with the mattress on the bottom, again she said "no."

47. Earl having allegedly tested negative for covid19 still intermittenly experienced extreme headaches, vertigo, blurred vision, sounds of running water in his ears during sleep, and general lethargy. Placing [h]im in a dangerous, potentially fatal cell in SMU infected with deadly covid19 and given his pre-existing medical conditions, not to mention having witnessed the loss of a friend to covid19 (Robert Littlefield) Earl feared for his safety and even life.

48. The next morning at around 4:00am Earl was awakened (having barely slept) by the same female officer, given a squeeze bottle of pre-op soap and told to shower. He was told that he would be putting on "clean clothes," so showered but the clothing brought him smelled of body odor, the boxers were stained with fecal matter, the socks were nasty, so Earl put those in the dirty clothes can, and re-dressed in his already clean clothing.

49. A short time later Earl was transported to MatSu Regional Medical Center (herein after MSRMC) for left hip replacement surgery.

-9-

50. Following the surgery, the surgeon, Dr. Gregory Strohmeyer told Earl it was a **"picture perfect surgery"** and leter that same day Earl was returned to GCCC, and hot to the Infirmary as is customary, but back into covid-central-SMU. Once he entered (masked) he was told to go to SMU14, to which he flatly refused, explaining to the officer (Long) the previous issues with the cell, the pre-existing ADA 2000 obligations, and he had cell SMU26 cleaned and disinfected, and moved Earl in there instead. He even brought another mattress for Earl to use.

51. It should be noted by the Court that the so-called **"covid protocol"** was inadequate and inconsistent, and even laughable if it wasn't so serious. Done by inmates who did not particularly care about disinfecting, masks, social distancing, etc, if not completely absent at times.

52. It should be noted by the Court that on 11/19/20, the same day Earl returned from his serious surgery, there had been issued two medical directives from Medical Director Dr. Robert Lawrence to Defendant Eric Nimmo of GCCC medical department. The first was for Earl to have a **"caregiver"** or what is called a Personal Care Attendant (herein after PCA) for 14 days and at least 2 hours per day, the second was for a wheeled-walker.

53. Earl was issued a wheeled-walker to use in his 7X9 prison cell, but was not afforded a **"caregiver"** as directed. In fact the Medical Communication had the 14 day requirement for a PCA scribbled out with pen. This can have only been done by medical staff at the direction of defendants' Strommer or Nimmo, or some yet to be discovered superior.

54. A few days later, early a.m. Earl was awakened by Unit Team Officer (herein after UTO) Greenland, to sign for legal mail, and when Earl got up out of the bunk, grabbed the wheeled--walker (which was properly locked) he slipped on the slick cement floor and fell directly upon his rearend.

55. UTO Greenland asked him **"are you okay?"** and Earl replied that he was, because he didn't appear, nor feel injured at the time. But UTO Greenland signed for the legal mail for Earl (because Earl was still on the floor attempting to get on his feet) then left.

-10-

56. The evening after the fall, Earl noticed that his left thigh was swollen, warmer to the touch and redder then the other leg. As he was getting into his bunk (having been taught to grab his pants leg to assist the left leg up) he heard a loud popping sound and was instantly thrown into excruciating pain, making any movements unbearable.

57. Staff heard his cries of pain and came to the cell, he was attemepted removed but because of the pain it was abandoned and an ambulance was called, while Toradol was given Earl to ease the pain. The ambulance arrived about 1 hour later with EMS Jenifer & Erin in attendance, Earl was removed from the bunk with corrections officers assisting, placed on a gurney and taken to the awaiting ambulance. Earl was given Ketamine and transported to MSRMC Emergency Department (herein after ED).

58. According to MSRMC records, Earl arrived at ED at 01:19hrs, 11/26/20, and covid test was performed in a tent outside of the hospital, with negative results and Earl was returned to ED, where then Attending Physician Joseph Moss Alter, MD, administered somekind of pain shot, ordered x-rays and left the examination room.

59. When Dr. Alter re-entered the exam room, Earl told him of the recent surgery, the slip and fall at GCCC/SMU and that his left leg "was redder and swollen since the fall," and that his **"rearend felt hot and as if it was filling up with blood,"** asking the doctor **"what's wrong?"**

60. Dr. Alter told Earl that he couldn't see **"anything wrong,"**

61. According to MSRMC records, at 02:22 Orthopedic surgeon Dr. Charles Haggerty ordered CT scans with contrast, and about 03:00 they were taken, and showed **"acute nondisplaced greater trochanter fracture with edema in adjacent musculature and subcutaneous soft tissue."** These scans were ordered for Earl as an **"outpatient."**

62. According to MSRMC records, at 07:57, defendant Dr. Charles Haggerty, **"evaluated after reviewing imaging and suggested the patient be followed outpatient with knee immobilizer brace."**

63. This "suggestion" was in direct conflict with nursing staff observations, and cooborating CT scans. (See Nurses' Breen, Lambring and Paradis)

-11-

64. Earl was again returned to GCCC-SMU **"covid-central"** where he spent the night in his wheelchair, unable to move to the bunk, and later was yet again returned to MSRMC per Dr. Strohmeyer, for repairative surgery to fix the damages caused by the slip and fall, where obvious and recognizable damages to the **ischium** and **acetabulum** and left thigh bone that had sustained splitting (**dehiscence**) caused by the implant being forced down the thigh bone upon hitting the floor. In fact Dr. Strohmeyer seemed surprised to hear (during a follow-up appointment) that Earl had been returned to GCCC only to be returned to MSRMC, when he should have went from ER to OR.

65. Earl spent the next 8 + days recovering from the second repairative surgery and was given numeous opiates for pain, numerous and different types of anti-bioatics due to the elevated potential for bacterial infection. In fact, Dr. Strohmeyer stated that if he got infection in the wound he's **"have to open him back up"** which cause grave anxiety, stress and fear, not to mention returning to GCCC and no assistance.

66. Earl was returned to GCCC-SMU on 12/05/20 and instead of being placed into the Infirmary as logic would dictate, his placement was geared towards not having immediate access to defendant Dr. Eric A. Nimmo. This defendant accomplished this by subterfuge under the guise of "covid-quarantine" eventhough Earl had tested negative numerous times and there were beds available in the Infirmary.

67. Earl was awash in anxiety, depression, pain and suffering, as a result of his repairative surgery, his hospital stay, the opiates and anti-biotics given, the fear of infection and subsequent thrid possible surgery, and when he was returned to SMU he became extremely verbal about obtaining some assistance, due to him **not** having received a Personal Care Attendant (herein after PCA) as had been ordered 11/19/20 per Dr. Robert Lawrence. **"They"** subsequently decided it would be a good idea to get Earl a PCA, that could assist him in all aspects of recovery, which would have eliminated Earl's slip & fall, unnecessary injury, damages, pain and suffering.

68. Inmate Earnie Rodger's a covid-worker in SMU, who was already employed volu-

-12-

teered to assist Earl, by bringing his food trays, clean clothing, and once with fixxing his bunk. He however, did **not** assist in any way with rehabilitation or therapy, even though Earl had been told to **"use your walker as much as you can, but not full weight."**

69. 12/13/20 Earl woke up to blood seeping from under bandages, a male nurse came took pictures and promised to return to fully change bandages, but did **not return.**

70. 12/29/20 the **renewed** 14 day covid quarantine for Earl was to conclude, so [h]e submitted an RFI to defendant Earl L. Houser (superintendent) and defendant Eric Nimmo, as to why he remained in quarantine. This after Earl had requested earlier why, and was told by defendant Houser, **"Sir, this is the safest place for you."** In the current RFI it was asked "if I am in the safest place, according to you, then why were 42 **confirmed covid positive inmates brought in earlier this morning?"** Defendant Houser basically blames his bosses stating **"Sir, this is a departmental matter on moving inmates, it's not in the facility's control."**

71. Earl believes this act was indeed arbitrary and done under the guise of covid where [h]e had been quarantined for a combined **41 days** even though he'd tested many times negatively before returning from MSRMC the second time. He asserts further that his situation was indeed due to the defendants' combined efforts to defray from the amount of days they could not fulfill their contractual obligations under the 2000 ADA "Final Decision," not to safeguard Earl, but to benefit themselves. This caused Earl more depression more anxiety, anger and trepidation, unnecessarily.

72. Earl was indeed released from SMU, after this exchange, and sent to the Infirmary. It was contended by an Infirmary PCA that during the time Earl was in SMU, there was a minimum 3 empty beds available in the Infirmary. Had Earl been properly housed following his serious initial surgery, wherein he'd have automatically had a PCA 24 hours a day to assist him, the accident, injuries, second repairative surgery would never have occurred, or at the very least would have been reduced 99.9%.

-13-

73. Earl having exhausted the informal RFI's and grievance processes concerning the reinstatement of the ADA Assistive Items (to wit: 1 banana per-day and lactose-free milk) which had been denied by in-house defendants,' submitted a formal Accommodations Request under P&P 808.16, this too was denied by the in-house defendants,' and DOC administrator defendants, so Earl submitted an appeal to defendant David Newman, the A.D.A. Coordinator for the State of Alaska. [H]e basically parrotted what the DOC defendants' stated, did **no** independent reviews, investigations, nor spoke with Earl regarding the necessity of the ADA Assistive Items, nor the longevity of their useage. This left Earl no other form of relief.

74. Earl would assert that since the defendants' State of Alaska and Department of Corrections, has arbitrarily removed medical hardcopy files from the facilities and thus ready access by the inmates,' when reviewing the so-called findings in the Prisoner Request Fot Accommodations under the aforementioned policy, in the "Health Care Provider Information" each defendant (in and out) claimed that Earl has had a **"history of a colostomy since 2005."** This is factually innacurate. The actual date [h]e received this disgusting life-devastating curse was **April 11, 1996.** Additionally, defendant Strommer gave her two-cents worth asserting "eating the assistive items doesn't make Earl disabled, and he has access to a toilet 24/7 at Goose Creek Correctional Center." Defendant Brooks claimed "nothing in the inmate's record indicates that there are any major life activities that cannot be performed." These statements are demonstrative of deliberate indifference, by each and every defendant who agreed with the findings and signed off on their veracity and reliability.

Had a fair and full review of the records been performed by the combined defendants' their ludicrous and meritless statements would have been obvious even to them.

75. On 1/30/21 Earl wrote a letter to defendant David Newman displaying [h]is errors in agreeing with GCCC/AkDOC defendants' and copied him with a letter that was sent specifically to defendant Brooks. This letter showed verbatim what a person with a qualified disability entailed statutorially.

-14-

76. 2/22/21 Earl was instructed to go "Intake" apparently for an outside medical (herein after OSM) this was confusing since Earl had already had a surgical followup with Dr. Gregory Strohmeyer regarding the hip repair/replacement. When he got there he asked what the OSM was for, and was told the appontment was for "a chest x-ray." Earl stated he had no information, nor had he seen anyone regarding chest x-rays, and refused to be transported out of the facility. Earl was immediately taken to medical wherein he was interrogated by defendant Strommer, and explained to [h]er that he had no idea, nor had he been seen, nor consented to any x-rays of his chest. Defendant Strommer said that then "you need to sign the refusal," but Earl told her that he did not trust her and wouldn't sign because they did not follow proper procedures, and Earl left medical.

2/23/21 Earl received a bill (see voucher #402025) for $25.00 which was deducted off his account. He immediately submitted an RFI showing policy and procedures the defendant did **not** follow, requesting his $25.00 returned. The RFI was responded to by Nurse III Brianna Eisenbacher asserting that the deduction was valid, alleging (albeit erroneously) that Earl had spoken to the provider who ordered the x-rays, "a few days ago regarding the procedures."

77. Earl sent HARS Director/defendant Luara Brooks a letter which included this issue 12/28/21, citing P&P #808.08VI requesting the $25.00 be reimbursed. This appeal was **ignored.**

78. The same day Earl received a medical communication with instructions to "use a pillow for proper hip positioning (place hips in abduction) for sleep to reduce pain and prevent dislocation." This recommendation should have been given upon completion of the 11/19/20 surgery, not over 3 months after the fact.

79. The letter Earl wrote to defendant David Newman was responded to 3/10/21. [H]e conclusion was that "The DOC has reversed a part of its determination and now acknowledges your colostomy is a disability under the American's with Disabilities Act (ADA)." This determination was renered after Earl had informed them of the statutorial lack of knowledge regarding what constituted a "qualified disability," something they should have known.

-15-

This brings into serious question all of their disability and ADA related decisions and arbitrary discontinuances of well established ADA Assistive Items, the 2000 ADA "Final Decision," how Earl was mistreated, and fully supports deliberate indifference as well as **"cruel and unusual puniswhment."** Defendant Earl L. Houser, defendant Villacorta, defendant Goode all signed--off on the aforementioned arbitrary ADA related denial(s).

80. What is even more disheartening is that the State of Alaska A.D.A. Coordinator and defendant David Newman failed a qualified person with a disability, who's very daily life (even as a prisoner) has been negatively affected, complicating a previously tolerable life when utilizing the ADA Assistive Items. Instead he actually wrote the following: **"DOC medical still advises the best treatment for your colostomy is to choose high fiber food options [from your meal trays]"** almost verbatim of the in-house defendants responses.

It may surprise this Court that banana's are indeed "high fiber foods' and lactose-free milk when consumed contributes to digestive health for those in the plaintiff Earl's situation. In addition, purchasing "Lactaid" as recommended by defendant Strommer is never available on the commissary, so that recommendation is without merit. Moreover, GCCC medical has instead ordered what is called **ILEO-SORB pkts.** which are put into the colostomy pouche to soak up the liquidy stool, making it more solidified, all at more expense, and it is **not consistently available** for refill. Earl has went 2-3 weeks without this so so product.

81. 3/31/21 having received no response from defendant Laura Brooks regarding the $25.00 deduction mentioned above, Earl wrote a 2 paged letter to the Department of Corrections health care Administrator (herein after HSA) whom he thought had been defendant Brooks and sent it directly to the defendants' central offices in Anchorage. To date no reply...

82. After purchasing the Electronic Health Record (herein after EHR) which was to be 291 pages, at a cost of $90.25, Earl found blatantly false and erroneous dates, times and circumstances. He submitted an RFI on how these could be corrected, since the inmate's medical records were not accessible via hardcopy at the facilities anymore, but in the total computer control of the Department.

-16-

83. The aforementioned RFI was **"Forwarded to Central Medical Records"** by Nurse III C. Hampel, and was later responded to by records clerk [Maletch] who wrote, **"This is original documents. I don't think you can correct them."**

84. Due to the extent of the damages to the initial left hip-replacement, caused by the slip and fall of Earl while in SMU, and subsequent necessity for s second repairative surgery, Earl was forced to endure more hospital time to recover from that operation. He was forced to endure more pain and the useage of opiates to attempt to manage that pain. He was forced to endure a variety of IV administered anti-biotics, and the fear of a potential bacterial infection which would require yet a third surgery. He is forced to endure more therapy, more rehabilitation, unresolved ambulatory issues, like standing and walking. He is forced to continue the useage of a wheelchair and wheeled-walker to get around. And, he is forced to be restricted in the type of institutional jobs he'll be allowed. All of these detriments could have been avoided had GCCC named medical defendant Eric Nimmo and Angela J. Strommer, would have placed Earl in the Infirmary following the initial 11/19/20 surgery, or at the very least followed the Medical Director's Order and hired a "caregiver" (PCA) while Earl was in SMU. In the Infirmary Earl would have automatically received the assistance 24/7 from a PCA, since SMU **"covid-central"** was indeed **not** the appropriate lodging for anyone post serious surgery.

85. Just as important, Earl continues to suffer what can only be explained as residual coronavirus (covid19) long-term side-effects. These issues are: loss of balance **not associated** with the surgeries, persistent headaches, ocassional and sudden blurred vision, muscle weakness (various parts of the body) ocassional diziness, lethargy, and general malaise. Also it should be noted that during sleep, there is the sound of running-like-water in the ears, that is when sleep can be attained. Earl believes other medical and physiological issues exist as well. These on-going issues have not abated, and gives Earl grave concerns of his future, further exacerbating his depression, anxiety and distress.

Earl's life before being sent to GCCC (even taking into account the deteriorated hip) was at least tolerable, but taking the events together with the disability is unbearable.

-17-

C A U S E S   O F   A C T I O N

86. Earl realleges and incorporates the allegations set forth in the proceeding paragraphs as if fully set forth herein.

87. Defendant(s)                                        jointly and/or severely their employees, and agents owed a pre-existing duty of care to Earl as a qualified individual with a disability, under state statute, departmental policies and procedures, Title II of the American's with Disabilities Act of 1990 and the 2008 amendments, the ADA "Final Decision" of 2000 which is an agreement between the defendants and Earl, "under color of law." All are enforceable **"no matter where he is housed, until the end of his sentence."**

88. As it relates to the "Final Decision" rendered in 1999-2000 it makes incumbant upon the defendants, to have reasonable and expected disability accommodations directly related to Earl's disability while incarcerated and at all state and privately operated correctional facilities, and until Earl's unconditional release.

89. During the 1999-2000 year, a corrections departmental policy and procedure which is directly related to prisoners' with qualified disabilities who request ADA Accommodations, was ratified during the same timeframe, put into practice under P&P #808.16.

90. The aforementioned policy at section VI, under the heading **Observation and Implementation:** clearly holds defendant(s) liable for violations, stating in part "If at any time it is found that an employee wilfully failed to observe and implement this policy, including **implementation** of any reasonable accommodations that are **approved and granted to** a prisoner, the employee or employees may be subject to discipline, up to and including **dismissal.**"

91. As with Title II of the ADA, the departmental policy contains implicit requirements to reasonably accommodate a qualified individual with a disability, imposing an affirmative duty of care and legal constitutionally mandated obligations upon public entities, making no statutory exceptions to that duty, nor are those recognized violations

-18-

excused by the Eighth Amendment to the United States Constitution, nor its state counter-parts, as is delineated in state statute AS 18.80, nor the Fourteenth Amendment to the United States Constitution, nor its state counterparts.

92. Defendant(s)                                                                    jointly and/or severely their employees, and agents violated Earl's rights under the ADA, departmental policies and procedures, state statutes and the "Final Decision" 2000 ADA agreement, all of which Earl had a right to exercise and enforce.

93. These unlawful acts and/or ommissions of defendant(s) were done knowingly and did deprive Earl the rights secured him under the aforementioned provisions and "color of law."

94. Earl is informed and believes that the acts and/or ommissions of defendant(s) jointly and/or severely were intentional as they knew or should have known their duty of care to Earl under the well established laws and agreement, regarding disability accommo-dations, and thereby defendant(s) failed to protect and preserve those rights and expecta-tions, and thus were deliberately indifferent to Earl's needs and to the likely negative consequences inflicted upon him.

95. Defendant(s) violations amounted to tortrous conduct, of which caused severe emotional distress to Earl.

96. As a direct and proximate consequence of these unlawful acts and/or ommissions of defendant(s) Earl suffered and continues to suffer, and is entitled to compensatory, puni-tive, exemplary and if applicable special damages allowed by law.

**SECOND CAUSE OF ACTION:**

97. Earl realleges and incorporates the allegations set forth in the proceeding paragraphs as if fully set forth herein.

98. Defendant(s)                                                                    jointly and/or severely their employees, and agents became **joint-tortfeastors** when they breached to 2000 ADA "Final Decision" agreement between Earl and applicable defendant(s), by their failure(s) to fully accommodate, expected ADA accommodations at GCCC.

-19-

99. Defendant(s) the "Final Decision" agreement made it incumbant upon defendants to fully and without exceptions, properly and completely accommodate plaintiff and disability while in their care and custody, **"no matter where he is housed, until the end of his sentence,"** and by not doing so were acting with deliberate indifference to said legal duties and obligations, which they knew or should have known since the "agreement" was 20 years in existence, giving defendant(s) no valid excuses for not accommodating Earl.

100. Defendant(s) jointly and/or severely their employees, and agents owed a **pre-existing duty** under the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and the State of Alaska constitutional counterparts, under Article I, under common law and under "color of law." This duty applied to the health and safety of Earl while in their care to which their acts and/or ommissions created a hostile environment further demonstrating the failure of the duty of care as well.

101. These unlawful and violative acts and/or ommissions breached a bonafide and well established contract **in fact,** and was done so intentionally with professional incompetence, malice, negligence and prejudice, wherein defendant(s) jointly and/or severely believed they could disregard the laws of contract, their legal obligations under the ADA and even their own policies and procedures. They simply failed deliberately whether they knew of the likely negative consequences suffered by Earl, or turned a blind-eye, Facts and the laws relevant to this complaint will demonstrate their combined malfeasance.

102. Defendant(s) violations amounted to **tortrous conduct,** intentional breach of contract/agreement/ ADA expectations **in fact,** which caused Earl severe emotional distress.

103. As a direct and proximate consequence of the unlawful and violative acts and/or ommissions Earl has suffered and continues to suffer, and is entitled to compensatory, punitive, exemplary and if applicable special damages allowed by law.

-20-

**THIRD CAUSE OF ACTION:**

104. Earl realleges and incorportaes the allegations set forth in the proceeding paragraphs as if fully set forth herein.

105. Defendant(s)                                         jointly and/or severely their employees, and agents used threat of isolation and intimidation language in direct violation of 42 USC § 12203(b) to attempt to dissuade and interfere with the ADA rights Earl was legally allowed to exercise and enforce regarding the pre-existing 2000 ADA "Final Decision" wherein expectations had been established as to his housing accommodation regarding the qulified disability. Defendant(s) also used egregious and false inferences concerning Earl's safety and exposure to Covid19 infection/virus, and did so by protract-ing covid-quarantine under the guise of said alleged safety. Defendant(s) used SMU which is a segregation unit wherein inmates are locked down 23 hours of every day, to defray from the already numerous days of failings of their pre-existing duty of care to properly accommodate Earl in an open-population setting wherein his custody level and good behavior did not justify the combined 41 days in SMU, especially since he'd tested **negative** for the covid many many times before leaving the hospital following serious surgeries. They did so for their benefit and not for Earl's safety.

106. Defendant(s)                                         jointly and/or severely after the 14 day mandatory covid-quarantine arbitrarily impinged upon Earl's right to re-habilitation under the Alaska Constitution Article I § 12, and his rights under established departmental policy to be housed **"in the least restrictive setting"** thereby intentionally perpetuating tortrous and egreious unlwful conduct, and retaliation for Earl previously exercising and attempting to enforce his rights under the ADA 2000 "Final Decision" and doing so with deliberate indifference to Earl's rights under the color of law, causing severe emotional distresses brought about by isolation unjustified.

107. As a direct and proximate consequence of these unlawful and egregious acts and/or ommissions Earl has suffered and continues to suffer and is entitled to compensatory, punitive, exemplary and if applicable special damages allowed by law.

-21-

**FOURTH CAUSE OF ACTION :**

108. Earl realleges and incorporates the allegations set forth in the proceeding paragraphs as if fully set forth herein.

109. Defendant(s)                                                            jointly and/or severely their employees, and agents became **tort-feastors** when Earl presented the need for the continuance of the ADA Assistive Items (also known as ADA Assistive Technology) to wit: 1 banana per-day and the use of lactose-free milk (since 2001 and 2019 respectively) for the management of digestive disability, to wit: complicated colostomy, and the associated stomach distresses and fecal flow output minimization, which did enhance Earl's life.

110. While true, Earl did not necessarily need to pursue the aforementioned ADA Assistive Items via Prisoner Request for ADA Accommodations under policy and procedure #808.16 prior to arriving at GCCC. The previous state facility in Juneau LCCC recognized the life enhancing and simple "items" viability and mere furnished them upon Earl's request and explaination of the positive bature of them. The defendant(s) at GCCC simply summarily denied them, depriving Earl with deliberate indifference, the benefits, having not spoken to him, nor contacting LCCC to verify that his statement was truthful and for the longevity of their individual useage.

111. Defendant(s) deliberately refused to verify, denying, not based upon any actual disability or medical logic, but due to pecuinary reasons and obvious personal beliefs under the guise of so-called medical applicability. The denial of the important and beneficial "assistive items" was and continues to have negative impacts upon Earl's daily life, further causing Earl unnecessary and severe emotional and physical distresses.

112. Defendant(s) acts and/or ommissions of this well-established a successful disability management items amounted to deliberate indifference to perpetuate cruel and unusual punishment..

113. As a direct and proximate consequence of defendant(s) Earl suffered and does **in fact** continue to suffer and is entitled to compensatory, punitive and exemplary damages and if applicable special damages allowed by law.

-22-

**FIFTH CAUSE OF ACTION:**

114. Earl realleges and incorporates the allegations set forth in the proceeding paragraphs as if fully set forth herein.

115. Defendant(s)                                                        jointly and/or severely their employees, and agents by the acts and/or ommissions to accommodate Earl's well-established disability rights, discriminated against Earl in violation of 42 USC § 12132 with each individual defendant liable in their official capacities (42 USC § 12203) for their roles in the deprivations of reasonable accommodations (notwithstanding 2000 ADA agreement) for those qualified individuals (42 USC § 12101-12117 and state statutes AS 18.80.010-300 and AS 09.55.540) and their duty of care, "under color of law."

116. Defendan(s) unlawful deprivations of accommodations to which Earl was an intended beneficiary, the defendant(s) knew or should have known their duties, and by the ommissions their acts amounted to violations of the Eighth Amendment to the United States Constitution and the Alaska State constitutional counterpart against "cruel and unusual punishment." These practices had no legitimate penalogical goal, and cannot merely be blamed away on covid, as the very structure of the buildings in open-population have no actual ADA cells, and any reliance upon the 2010 Standards for Accessible Design is not applicable expost facto (it may be okay in Florida but not in Alaska) when regarding the defendant(s) accummulative responsibilities and duty of care to Earl.

117. As a direct and proximate consequence of these unlawful and wanton acts and/or ommissions of defendant(s) Earl is entitled to compensatory, punitive and exemplary damages and if applicable special damages allowed by law.

**SIXTH CAUSE OF ACTION:**

118. Earl realleges and incorporates the allegations set forth in the proceeding paragraphs as if fully set forth herein.

119. Defendant(s)                                                        jointly and/or severely their employees, and agents, and by their acts and/or ommissions caused the Negligent Infliction of Emotional Distress [IIED] upon Earl.

-23-

120. Earl constantly complained of the humiliations, embarassments and hardships dealt with each and every day, every time he had to do self-care of his disability in the presence of other inmates and staff. However, defendant(s) basically had no responses, demonstrating intentional recklessness, deliberate indifference, to the detriment of Earl, and the benefits of the Department of Corrections.

121. Defendant(s) failed their duty of care, in conjunction with the knowingly flagrant disregard for the American's With Disabilities Act, in many facets at GCCC which smacked of extreme, outrageous and total failure of contemporary decency of an evolved society, supporting intentional recklessness and certainly carelessness, all of which cause Earl great mental anguish, emotional melt-down, physical pain and he even contemplated suicide at one point early in the gays following the covid quarantine in SMU (a segregated unit) and if there is a more descriptive word for severe it would apply to what Earl was forced to endure, day in and day out, many times each day.

122. As a direct and proximate consequences of the extreme, outrageous, reckless, indecently gross and wanton acts and/or ommissions of defendant(s) Earl is entitled to compensatory, punitive, exemplary and if applicable special damages allowed by law.

SEVENTH CAUSE OF ACTION:

123. Earl realleges and incorporates the allegations set forth in the proceeding paragraphs as if fully set forth herein.

124. Defendant(s) willful negligence jointly and/or severely put Earl in extreme medical jeopardy and failed their duties of care, and their duties to disclose to Earl under State Statute AS 09.55.556 the state of his injuries, after the first surgery, following the slip and fall in SMU requiring second repairative surgery, the return from emergency room visits, so as to properly inform him as required by law.

125. As a direct and proximate consequences of the recklessness, carelessness, gross negligence and failure to exercise the degree of knowledge, or even to inform Earl of the true state of his injuries (so he could make informed decisions) this did cause Earl to suffer emotionally, physically and Earl is entitled to compensatory,

-24-

punitive, exemplary, and if applicable special damages allowed by law.

## INJUNCTIVE RELIEF

126. Earl realleges and incorporates the allegations set forth in the proceeding paragraphs as if fully set forth herein.

127. A real and immediate difference exists between Earl and the Defendant(s) and it regards Earl's rights as a prisoner, and their duty owed to [h]im at various stages and events. Defendant(s) while in different official positions, perpetrated varying categories of deprivations against Earl, and what they did or didn't do, jointly and/ or severely did result in physical and emotional injuries, some with long term consequences. The fact that Earl is a state prisoner clearly played a distinct and negative role in how he was treated and mistreated, making medical diecisions as as so-called "guardian" and without Earl's direct input, disregarding proper considerations as to his wishes medically, and must be held accountable for their actions and/or ommissions or they will continue to blatantly exercise their ill-discretions with the same unbridled carelessness as they negligently, and deliberately did in Earl's circumstances.

128. The defendant(s) acts and/or ommissions alleged violated Earl's rights under color of law, and they seriously could not have assumed their conducts reasonable nor lawfully appropriate, in the totality of the circumstances.

129. As a direct and proximate consequences of the acts and/or ommissions of defendant(s) Earl has suffered and will continue to suffer damages through the physical and mental injuries to his person.

WHEREFORE, Earl prays relief as follows:

> 1. For a permanent injunction enjoing defendant(s) from engaging in the practices and conducts complained herein;
> 2. For declaratory judgment that defendant(s) jointly and/or severely violated Earl's rights as outlined above.
> 3. For damages of $500,000.00 cumulatively for all violative conducts

-25-

4. For costs associated with bringing forth this suit pro se.

5. For such other relief as the Court deems just and proper.

DATED this 7th day of July, 2022.

Respectfully Submitted,

By:_____

Jack Lawrence Earl, Jr.

PLAINTIFF, pro se

-26-